Exhibit D

```
-----------------------------------------------X
In the Matter of the Arbitration Between       :
                                                :
Kuehne & Nagel Ltda.,                           :
                                                :
      -and-                                     :
                                                :
Seamount International Association Ltd.         :
and Scan Trans Inc. (Houston)                   :
-----------------------------------------------X
```

## INITIAL SUBMISSION OF SEAMOUNT INTERNATIONAL ASSOCIATION LTD. AND SCAN TRANS INC. (HOUSTON)

By and through its counsel, Tisdale & Lennon, LLC, Seamount International Association Ltd., (hereinafter referred to as "Seamount") makes this Initial Submission in support of its application for a final award granting its claims for freight, detention, outstanding expenses, and reliance damages together with costs and legal fees as against Kuehne & Nagel, Ltda. (hereinafter referred to as "K & N").

## FACTS

On December 10, 2003, Seamount fixed the M/V Global Traveller (hereinafter the "Vessel") with K & N via a Conline booking note. *See Booking Note annexed hereto as Exhibit "1."* At all material times Seamount was the Owner of the Vessel, Scan Trans was its agent, K & N was the charterer of the Vessel, Ambev was the cargo owner, and Narval was the broker. *See Bill of Lading annexed hereto as Exhibit "2."*

In accordance with the Booking Note, the Vessel was to load a second-hand knocked down brewery in Santos, Brazil for discharge in Callao, Peru. Notably, the booking note expressly stated that the Charterer must provide the final packing list 10 days prior to the vessel's arrival. *See Box 9 of the Booking Note at Exhibit "1."*

1

The initial booking was for 14,633.04 cbm (cubic meters) of cargo. *See Packing List referencing 14,633.04 cbm of Cargo annexed hereto as Exhibit "3."* However, on January 21, 2004, K & N submitted their preliminary packing list to Seamount, showing their intention to carry an increased quantity of cargo, approximately 18,000-18,500 cbm. *See K & N's Packing List as sent by the broker, Naval, referencing 18,000 cbm of Cargo and Confirmation E-mail sent from Seamount annexed hereto as Exhibit "4."*

K & N then negotiated a more favorable deal with Seamount based on the premise that a larger amount of cargo would need to be transported. Specifically, after the additional nomination of cargo, Seamount agreed to provide K & N a discount on the containerized portion of the cargo. The discount was effected by giving K & N the right to load "part" cargo in containers to maximize cargo intake on the Vessel. *See E-mails regarding Negotiation annexed hereto as Exhibit "5."* Seamount made these concessions, reducing K & N's potential freight liability, based on K & N's representations that it would ultimately nominate 18,000-18,500 cbm in cargo.

In addition, in further reliance of K & N's representations regarding the volume of the cargo as being between 18,000 and 18,500 cbm Seamount began fabricating a racking system in order to accommodate certain pieces of the extra cargo. *See Invoices for Planning, Construction, and Storage of Racking System annexed hereto as Exhibit "6."* At all times K & N was aware that Seamount was building the racking system. *See E-mails from Thomas Damsgaard referencing the Racking System annexed hereto as Exhibit "7."* K & N was even asked to provide the dimensions of the cargo to the appropriate parties in order to facilitate the construction of the racking system. *Id.*

2

However, as the date of the Vessel's arrival approached, K & N continued to ignore Seamount's repeated requests for a final packing list. Ultimately, K & N failed to provide a final packing list 10 days prior to the arrival of the Vessel. *See E-mail Correspondence regarding Packing List Requests and March 4, 2006 Packing List annexed hereto as Exhibit "8."* As the Vessel arrived on March 5, 2004, K & N was obligated under the Booking Note to provide its final packing list to Seamount by April 26, 2004. *See Santos Notice of Readiness and Statement of Facts annexed hereto as Exhibit "9."* However, at the ten-day deadline, the most complete packing list in possession of Seamount nominated approximately 18,000 cbm in cargo. *See E-mails from Thomas Damsgaard Regarding Packing List annexed hereto as Exhibit "10."*

K & N did not produce a final packing list until loading had commenced on March 4, 2006. *See Exhibit "8" and Final Packing List Acknowledgments annexed hereto as Exhibit "11."* The list that K & N ultimately provided on March 4th was still far from complete, and reduced the amount of cargo to be carried by approximately 4,000 cbm. *See Exhibits "8" and "10."*

Disputes soon arose between the parties when it became apparent that K & N had short loaded the cargo to be transported to Callao in direct contravention of the packing list provided to Seamount ten days before the arrival of the Vessel. Further disputes arose between the parties when K & N failed to pay the terminal handling charges (hereinafter "THC") incurred at the port of Santos, as expressly required under the Booking Note. The Booking Note states that cargo must be brought under ship's hook by charterers at their time and expenses including THC. *See Booking Note at Exhibit "1", ¶¶ 20 and 31.* The stevedores, and the costs they incur in bringing the cargo under the ship's hook are therefore expressly for K & N's account. However, despite due demand, K & N failed to pay the THC to the Santos Stevedores, Grupo Porto. In

consequence, Grupo Porto took up collections with Seamount. *See Invoices for THC annexed hereto as Exhibit "12."*

Although K & N has argued that the stevedores were slow in loading, its protests ring hollow as any delays that might have occurred were caused by K & N's own contrivance. K & N failed to provide a final packing list 10 days prior to loading, which made it impossible for Seamount to preplan the loading and sequencing of cargo. *See E-mails from Thomas Damsgaard and Port Capitan Chris Lightfoot annexed hereto as Exhibit "13."* Standby costs were also incurred due to the delay and are still outstanding. *See Invoice of Standby Costs Incurred by K & N at Santos annexed hereto as Exhibit "14."*

K & N caused many problems by failing to provide the final packing list in a timely manner. In addition to the above, the P & I surveyor Narval attempted to carry out a joint loading survey in Santos; however, due to continuous repacking and consolidation of cargo packages carried out by K & N, as well as lack of a proper packing list and mis-labeling, it became literally impossible for Narval to complete an accurate cargo quantity survey.

Due to the inaccuracy of the preloading survey, Seamount and K & N agreed to a joint out-turn survey in Callao, and further agreed that the out-turn survey results would be binding upon both parties. *See E-mails Referencing Inadequacy of Narval Survey annexed hereto as Exhibit "15."* However, the parties never agreed as to what company should carry out the joint survey. As a result, K & N appointed Crawford and Seamount appointed Intersea.

There are now three different cargo volume measurement survey reports. Narval completed the joint survey during loading. Intersea completed the post-discharge survey for Seamount, and Crawford completed the post-discharge survey for K & N. Their results are as follows: 1) Narval 15,653.629 cbm including 21 containers; (2) Crawford 14,882.398 cbm

4

including 21 containers and (3) Intersea 16,195.180 cbm including 21 containers. *See Narval, Crawford, and Intersea's Surveyor Reports annexed hereto as Exhibits "16," "17" and "18."* While Seamount has made numerous efforts to reconcile the surveys, K & N and Crawford continually thwarted Seamount's attempts by barring Intersea's surveyors from accessing the cargo in storage. *See Note from Intersea's Attending Surveyor Richard Fistrovic annexed hereto as Exhibit "19."*

Furthermore, K & N has breached the terms of the Booking Note by failing to pay freight on the full amount of cargo transported. K & N remitted payment using the unsubstantiated and inaccurate Crawford survey report. K & N relies on Crawford's survey report even though it has made active efforts to keep Intersea's employees from verifying Crawford's calculations. K & N should not be allowed to benefit from its own malfeasance or that of Crawford.

Furthermore, K & N was delinquent in paying the initial freight payment   As such, interest is owed on the delinquent amounts. *See Initial Invoice of Freight issued on March 15, 2004 and E-Mails from K & N Acknowledging Liability for Interest annexed hereto as Exhibits "20" and "21."*

During the voyage the Vessel was informed that there was a labor strike progressing at Callao. *See Documentation of Strike at Callao annexed hereto as Exhibit "22."* In order to avoid delays, Seamount suggested discharging at another port. K & N declined this option and stated that they wanted to proceed to Callao. *See Correspondence with K & N regarding Labor Strike annexed hereto as Exhibit "23."* On April 2, 2004, the Vessel tendered its notice of readiness in the port of Callao. *See Callo Statement of Facts annexed hereto as Exhibit "24."* Due to delays at Callao, Seamount was forced to wait for a berth. Loading was further delayed by the strike. Additional expenses were incurred for overtime, meals, etc. in order to facilitate

5

discharge during the strike situation. *See Invoice of Additional Expenses due to Strike annexed hereto at Exhibit "25."*

After completion of the voyage, Seamount sent K & N a detailed list of the claims set forth above. However, instead of paying the amounts owed, K & N initiated arbitration pursuant to Clause 39 of the Liner Booking Notice. *See Letter from K & N's Counsel Initiating Arbitration annexed hereto as Exhibit "26."* K& N indicated that they were commencing arbitration to settle disputes concerning damage to cargo allegedly caused by Seamount.

The parties subsequently agreed to appoint Mr. David Martowski as sole arbitrator. On April 4, 2006, K & N notified Seamount and Mr. Martowski that, contrary to its earlier arbitration request, it would not assert any affirmative cargo claims. The scheduling order as set forth by Mr. Martowski was altered accordingly. Seamount's Initial Submission is presented in accord with the modified schedule.

## ARGUMENT

### 1. Cargo Quantity- Outstanding Freight

A "charterer's liability for freight is an independent obligation payable regardless of any claims the charterer may have for cargo damage or shortage." *Maersk, Inc. v. Royal Brands Int'l*, 2001 U.S. Dist. LEXIS 5308 (S.D.N.Y. 2001) (citations omitted). The Booking Note in the instant case also provides that "[f]reight is deemed earned upon completion of loading, discountless, and nonreturnable, ship and/or cargo or not lost" and freight is "100% payable abroad within (3) three banking days into carriers nominated bank account in Denmark..." *See Exhibit "1" at ¶29 and ¶30.*

Seamount invoiced K & N for freight based on the Intersea survey report detailing the value of the cargo carried. *See Invoice issued pursuant to Intersea's Survey annexed hereto as*

6

*Exhibit "27."* However, K & N has failed to pay the freight due and owing to Seamount despite a clear obligation to do so. K & N claims that there is no outstanding freight, based on the inaccurate survey completed by Crawford on its behalf. However, the accuracy of the Crawford survey is dubious at best as K & N and Crawford have systematically precluded Intersea from verifying Crawford's calculations.

While Seamount has made numerous efforts to reconcile the numbers, including efforts to locally identify cargo pieces in dispute and set up a joint re-measurement, K & N and Crawford have continually thwarted these attempts by keeping surveyors from accessing the cargo in storage. *See Exhibit "19."* Seamount has made further attempts to resolve the issues, including giving concessions to K & N to have three tanks missing from Crawford's report included in final figures and settle the quantity at the same. However, K & N refused to agree to this, or any other, amicable approach.

K & N has paid freight as follows:

| | |
|---|---|
| 12,953 w/m break-bulk at USD 45.00 | USD 582,885.00 |
| 21 containers x 77cbm x USD 35 | USD 56,595.00 |
| | USD 639,480.00 |

Seamount claims freight based on Intersea's out-turn survey figures:

| | |
|---|---|
| 14,577.760 w/m at USD 45 | USD 655,999.20 |
| 21 containers x 77.02 cbm x USD 35 | USD 56,609.70 |
| | USD 712,608.90 |

Thus, K & N owes Seamount the balance of freight in the sum of $73,128.90. Furthermore, Seamount claims 50% of the $6,880.00 out-turn survey costs: $3,440.00 as per ¶43 of the Booking Note and subsequent agreement between the parties. *See Intersea Invoice annexed hereto as Exhibit "28" and ¶43 of Exhibit "1."*

**2. Racking System Costs**

7

"'Promissory estoppel' is an alternative basis to breach of contract for seeking damages from the breakdown of a relation; if there is a promise of a kind likely to induce a costly change in position by the promisee in reliance on the promise being carried out, and it does induce such a change, he can enforce [the] promise even though there was no contract." *See 4 Williston on Contract §8:4 (4th Ed. 2006) citing Cosgrove v. Bartolotta*, 150 F.3d 729 (7th Cir. 1998). "A plaintiff must satisfy four elements to succeed on a claim of promissory estoppel: (1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced." *Calogera Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 100 (2d Cir. 2001) (internal citations omitted).

In this case, K & N made a promise to Seamount, when it nominated a greater volume of cargo than the minimum guaranteed under the Booking Note. K & N even sent an updated packing list to Seamount so they could make proper pre-loading arrangements and preparations for the extra cargo. K & N benefited from its promise by receiving concessions from Seamount that would ultimately reduce its freight liability. Seamount made considerable expenditures to its detriment in reliance on K & N's promise. Specifically, Seamount incurred $71,314.70 designing and constructing a racking system by which to carry the additional cargo K & N nominated.

Initial booking was concluded for about 14,000cbm of cargo. On the basis of K & N's original representations concerning the volume of cargo it intended to ship at the time the Booking Note was executed, Seamount nominated the Vessel "Global Traveller" for the voyage. But on January 21, 2004, K & N submitted a packing list to Seamount and declared that K & N intended to load 18,000 cbm of cargo. In reliance on K & N's declaration/promise of increased cargo quantity combined with a supporting packing list reflecting 18,000 cbm of cargo,

8

Seamount concluded that the nominated vessel, "Global Traveller" would require tanks to be double stacked on deck by means of a racking system. Seamount had, on an earlier shipment, for the same cargo owner (Ambev) utilized a similar racking system. As such, Seamount took immediate steps to design, and construct a racking system in order to accommodate K & N's additional cargo without delay. At all material times, K & N had knowledge of Seamount's construction of the racking system and the purpose thereof.

Ultimately K & N short loaded the cargo which rendered the racking system obsolete and an unnecessary expenditure. Furthermore, the Booking Note stipulates; "final packing list to be supplied 10 days prior to vessel's arrival by Charterers." K & N failed to meet its contractual obligation in this regard by failing to present a packing list until after commencement of loading.

Seamount relied on K & N's declaration of cargo quantity to its detriment, paying for the design and construction of the racking system necessary to transport the nominated cargo. The racking system, less monies received for scrap metal, cost Seamount $61,714.70. K & N is obligated to reimburse Seamount the cost of the racking system, which it *knew* Seamount was building to accommodate the nominated cargo.

### 3. Terminal Handling Charges at Santos

Cargo was loaded on liner terms, with all Terminal Handling Charges ("THC") for K & N's account, as is customary. The stevedoring company, Grupo Porto invoiced K & N for THC amounting to $30,681.74. *See Exhibit "12."* Due to K & N's failure to meet their obligations, Grupo Porto has turned to Seamount to satisfy their invoices and is holding Seamount responsible under Brazilian maritime lien laws, with an accompanying threat of vessel arrest.

Despite due demand, K & N has failed to pay the balance of the THC. There is currently a temporary commercial agreement in place between Grupo Porto and Seamount whereby Grupo

Porto has agreed to refrain from arresting Seamount's vessels. However the claim is still pending and the possibility of future arrest remains. Thus, Seamount claims $30,681.74 for indemnity for the THC or that K & N immediately settle the balance with Grupo Proto in order to lift the lien and threat of arrest against Seamount's vessels.

### 4. Standby in Santos and Callao

Cargo was loaded on liner terms pursuant to the Booking Note as follows: "Cargo to be delivered under vessel's hook as fast as vessel can receive and to be delivered under vessel's hook at discharge port as fast as vessel can deliver. If this is not happening, Damages for Detention to apply." *See Booking Note, Exhibit "1" at Box 11.*

Seamount incurred stevedoring standby charges waiting for cargo at the load port, Santos, and has issued a fully substantiated invoice to K & N amounting to $1,750.00. *See Exhibit "14."* K & N has refused to acknowledge or pay for the claimed detention. Seamount therefore claims against K & N for $1,750.00 for detention charges in Santos.

In addition, the Vessel was faced with a labor strike in Callao. In order to avoid having to divert the Vessel an alternate port for discharge, K & N agreed to absorb any additional charges incurred due to the strike. Seamount incurred extra security charges for transporting stevedores past blockades as well as meals and other incidentals for keeping the stevedores at the port. Seamount's principal claim for extra expenses incurred at Callao due to the strike is $3,650. *See Exhibit "25."*

Furthermore, commencement of discharge was held up awaiting customs documentation, and substantial delay in discharging was experienced due to delay in receiving cargo as well as the strike. Accordingly, Detention was incurred and K & N is therefore responsible under the

Booking Note. Seamount's principal claim for detention at Callao is $12,432.00. *See Invoice for Detention incurred at Callao annexed hereto as Exhibit "29."*

### 5. Loss of Interest

K & N delayed its initial freight payment beyond the terms of the Booking Note. The Booking Note provides that initial payment of freight is due within three business days after loading has been completed. K & N was duly invoiced on March 15, 2004. *See Exhibit "20."* Loading was completed on March 17, 2004. *See Exhibit "9."* As such, K & N's payment was due as early as March 17, 2004. As payment was not received until April 1, 2004, Seamount claims interest from March 20, 2004, roughly three days after loading had been completed. This amounts to approximately 13.1 days of interest. K & N has acknowledged that it must pay for the loss of interest, but has failed to do so. *See Exhibit "21."* Seamount applied a 5% interest rate to the amount invoiced as of March 25, 2004 ($611,980.00). Accordingly, K & N applied a daily interest charge of $83.83. Therefore, Seamount's principal claim for the delay of the initial freight payment is $1,102.14.

### 6. Legal Expenses and Interest

Legal expenses and interest are routinely awarded in New York SMA arbitrations. Seamount has incurred legal expenses in preparing and presenting its affirmative claims. Seamount thereby claims attorneys' fees and expenses, all of which will be established by affidavit of counsel at the conclusion of the arbitration. Furthermore, Seamount claims interest on all principal claims, accruing at 6.5% from the date of the breach (April 2004) until the conclusion of the instant arbitration.

### CONCLUSION

For the reasons stated herein, all of Seamount's claims should be granted.

Dated: May 12, 2006
New York, NY

Respectfully submitted,

SEAMOUNT INTERNATIONAL ASSOCIATION LTD.
and SCAN TRANS INC. (HOUSTON)

By: _____
Patrick F. Lennon, Esq.
Nancy R. Peterson, Esq.
Tisdale & Lennon, LLC
11 West 42nd Street, Suite 900
New York, NY 10036
(212) 254-0025
(212) 860-0067 fax
plennon@tisdale-lennon.com
npeterson@tisdale-lennon.com


TO:    Mr. ERNEST GELMAN
       45 Rockefeller Plaza – Suite 2452
       New York, NY 10111