# EXHIBIT F

1159069.1

# KUEHNE- NAGEL



To the
Danish Defence Club
Attn. Michael Boje-Larsen

DK-1360 Copenhagen K, Denmark

Kuehne + Nagel (AG & Co) KG
International Project Division
Pinkertweg 20
22113 Hamburg (Billbrook)

P. O. Box 10 37 60
20026 Hamburg

Phone (0 40) 73337-**753**
Fax    (0 40) 73337-761

Hamburg, March 3rd, 2005

Subject: M/V GLOBAL TRAVELLER – Santos / Callao
B/N dated 10th December 2004
Your Ref. 2004/00045/MBL – MBL/MSA

Dear Mr. Boje-Larsen,

Reference is made to your fax dated 24th January 2005 to Kuehne + Nagel - KN Servicios de Logistica Ltda, Sao Paulo and the subsequent communication.

Hereafter we give you our response – on behalf of Kuehne + Nagel - KN Servicios de Logistica Ltda, Sao Paulo - to the claim submitted on behalf of Compass International Association Ltd., c/o Scan-Trans Inc. for US$ 187,899.48, which is fully rejected for the reasons as outlined hereafter.

However, we are ready to invite you for a personal discussion and further clarification, if needed, to our Hamburg office.

## I. CARGO VOLUME

The claim for additional freight relates to a dispute over the cargo volume loaded and shipped on board the ship and we hereafter summarize the facts related to this issue:

### 1.1 Booking Note

The Booking Note is dated 10th December 2003 and

**Clause 9 – "Description of goods"** stipulates:
*"Minimum 14.000 cbm and no upper limit but of course only upto vessel's full capacity and Master's approval of stowage. Final packing list to be supplied 10 days prior to vessel's arrival by Charterer's."*

1

# KUEHNE—NAGEL 

**Clause 5 – "Vessel's name"** stipulates:
*MV Global Traveller* (Note: without any substitute foreseen for whatever reason) and the vessel's description being given in Clause 41 of the Booking Note.

**Clause 35 – "Full or part cargo"** stipulates:
*Carriers will load this as a full and sole cargo and carriers will load all cargo as presented on the packing list.*

**Clause 10 – "Freight rate"** stipulates:
*"Break-Bulk cargo: US$ 45.00 per w/m and US$ 1,000.00 per 40' socs up (limited) to 20 units basis full liner terms hook/hook."*

This means that the parties had agreed on a full and complete vessel to carry the cargo as specified in the booking note at a minimum freight of:

> **Containers:**
20 units of 40' Shipper's own Containers @ US$ 1,000.00 =   US$   20,000.00
which corresponds to a cargo volume of
20 units each 77 cbm = 1,540.000 cbm

> **Break-Bulk cargo:**
14,000 cbm, which is the minimum, less
<u>1,540 cbm</u>, which is the volume for the 20 units of 40' Containers
12.460 cbm, which is the balance of Break-Bulk cargo as per booking note.

@ the agreed freight rate of US$ 45.00 per w/m =    US$ 560,700.00

> **Discount:**
As per Clause 42 of the B/N the carrier agreed
to a freight discount of                                                           <u>US$   27,000.00</u>
In view of a sole call (loading port), i.e. Santos

> **Subtotal:**                                                                   **US$ 553,700.00**

> Less commission = 2,5% on ocean freight            US$    13,842.50

> **Total freight (minimum) payable to the carrier:**    **US$ 539,857.50**

This was the minimum freight agreed to perform the voyage of MV "GLOBAL TRAVELLER" for a minimum of 14,000 cbm from Santos to Callao.

**1.2    Assessment of cargo volume**

To assess the actual cargo volume the parties agreed in the booking note

2

**KUEHNE—NAGEL** 

**Clause 26 – "Measurement":**
*"All cargoes to be measured at the extremes for the purpose of calculating cargo cubic. **Carrier's surveyor** may measure and / or weigh the cargo to determine measurement and weight. Carrier's measure and weight (which can be taken from terminal's receiving report) to be used for purposes of calculating freight charges."*

It was agreed on 2nd February 2004 between the parties that such "Weight / Measurement Survey" shall be made by NARVAL Marine Services & Shipping Ltda, who are the (Carrier's) Agents / Shipbrokers as stipulated in Clause 1 of the Booking Note and are considered the "Carrier's surveyor". According to the terms of the Booking - Note Clause 43 - NARVAL's cost for the survey were shared equally by the carrier and K+N.

NARVAL's survey started on 4th February 2004 with the inspection of the steel tanks, which were the major components of the entire shipment, and was completed on 6th March 2004 as per the report of NARVAL. It stipulates that various pieces of (general) cargo needed to be stuffed in 40' containers (as foreseen already in the Booking Note dated 10th December 2003, where up to 20 units of 40' containers are already included in the total cargo volume).

The preparation and containerisation of smaller pieces was an on-going process during the time of NAVAL's "Weight / Measurement Survey" prior to the commencement of loading on board the vessel and the completion of the survey on 6th March 2004.

NARVAL's survey report is dated on 6th March 2004 – 2 days prior the date when the loading commenced on 8th March 2004 and indicated

| | |
|---|---|
| for the Break-Bulk cargo | 14,036.629 cbm |
| plus 21 containers @ 76.7 cbm = | 1,610.700 cbm |
| being a total of | 15,647.329 cbm |

In total 8.097 pieces of cargo had finally been stowed into 21 units of 40' shipper's own containers and 469 pieces had been shipped as Break-Bulk cargo, as stipulated on the carrier's bill of lading.

The Mate's Receipt signed between the Shipping Agents / Port Operator and the Master of the ship stipulate 21 Containers and 471 pieces of Break-Bulk cargo, however with the same total of 490 pieces (not 492 !) and thus it is assumed that the quantity of 469 pieces of Break-Bulk cargo as per Carrier's bill of lading should be the correct quantity, which is also confirmed by the documentation for the discharge in Callao, Peru.

Contrary to Scan-Trans' claim that K+N had not supplied the packing list 10 days prior to vessel's arrival at Santos, it is stated in their own e-mail dated 1st March 2004:

3

# KUEHNE - NAGEL 

*"We refer to packing list received Friday. We have furthermore just received a message from Mr. Gomes advising that this will be the final packing list, i.e. only 12.109 cbm and 20 containers to be carried."*

### Enclosure # 1

That Friday was the 27th February 2004 and was 9 days before the vessel tendered notice of readiness to commence loading at Santos port.

The shipment was a consolidation of cargo supplied by 13 individual suppliers (shippers), which are all listed in the carrier's bill of lading.

Since K+N had submitted the packing list only 9 days before the ship's arrival, as confirmed in Scan-Trans' communication dated 1st March 2004, Scan-Trans requested compensation – and K+N agreed to pay – a detention fee of US$ 20,000.00 lump sum to the carrier, which was for almost 2 days, calculated on the detention rate of US$ 10,500,00 per day or pro rate as per booking note clause 11, and is included in Scan-Trans' freight invoice dated 25th March 2004.

### Enclosure # 2

Since the 531 pieces included still several small pieces (for example 90 x 80 x 50 cm), which were finally packed into the 21 containers, the final quantity of Break-Bulk cargo was reduced to 469 pieces – as per carrier's bill of lading.

On 24th March 2004 NARVAL advised that – having been reviewed their previous survey report and considering the volume of cargo finally stowed into the 21 containers – the total volume of cargo loaded on board was finally

| | |
|---|---|
| 469 pieces of Break-Bulk cargo | 12,936.970 cbm |
| plus 21 containers @ 76.7 cbm = | 1,610.700 cbm |
| being a total of | 14,547,673 cbm |

The carrier's bill of lading signed for the voyage from Santos to Callao shows a cargo volume for 469 pieces of Break-Bulk cargo of 12,947.640 cbm – a volume almost identical with NARVAL's report of 12,936.970 and the difference of 10.67 cbm can possibly be ignored.

This correction and the final volume assessed by NARVAL was accepted by K+N.

### 1.3 Summary

In summary it is to be noted that

> ➢ the survey of cargo volume for calculation of freight cost was effected by the carrier's surveyor (NARVAL) - as agreed in the booking note - prior to loading,

4

**KUEHNE - NAGEL** 

- the carrier's surveyor (NARVAL) started the survey – and had access to all major components – more then 1 month prior to the ship's arrival at the loading port and nothing had prevented the carrier's surveyor at any time to give intermediate report about his findings to the carrier.

- K+N supplied the packing list 9 days prior to vessel's arrival and compensated the carrier with an agreed detention fee of US$ 20,000.00

- the survey report issued (and corrected by NARVAL) is confirming the volume of cargo as provided in the consolidated packing list of K+N

- the carrier's bill of lading was signed for almost the same quantity – with a minor difference of 10.67 cbm, which was accepted by K+N

- the quantity is in full compliance with the minimum cargo volume as agreed in the booking note (14,000 cbm) and Scan-Trans confirmed on 17th March 2004 that at the time of concluding the booking note (10th December 2003) the cargo volume was estimated to be 14,633.04 cbm.

The statement made by Scan-Trans in their e-mail dated 1st March 2004

**Enclosure # 1**

that

*"Owner's scheduled a bigger ship with about 11,000 cbm below deck space available, in order to accommodate the increased cargo quantity. Had we (Scan-Trans) been aware that minimum quantity would be loaded, **a smaller, better suited and more economical vessel would have been scheduled for the carriage.**"*

is not acceptable at all, since according to the Booking Note dated 10th December 2003 the nominated vessel was MV "GLOBAL TRAVELLER" without the carrier having the option to substitute this vessel with a smaller, better suited and more economical vessel. The nominated vessel was considered to be suitable to carry a minimum of 14,000 cbm as full and complete cargo and had finally loaded about 14,570 cbm on board the ship.

II.   **SETTLEMENT OF FREIGHT**

2.1   **Booking Note**

The Booking Note dated 10th of December 2003 stipulates in

**Clause 9 – "Description of goods"**:
*"Minimum 14.000 cbm and no upper limit but of course only upto vessel's full capacity and Master's approval of stowage."*

and in **Clause 35 – "Full or part cargo"**:

5

# KUEHNE–NAGEL



*"Carriers will load this as a full and sole cargo and carriers will load all cargo as presented on the packing list."*

The carrier's bill of lading is signed for

| | |
|---|---|
| 469 pieces of Break-Bulk cargo | 12,947.640 cbm |
| plus 21 containers @ 77 cbm = | 1,617.000 cbm |
| being a total of | 14,564.640 cbm |

Upon completion of loading and calculation the freight cost a dispute had arisen between the carrier and K+N, since - to the surprise of K+N – Scan-Trans expressed that in carrier's opinion a quantity of 18.000 cbm was booked by K+N and the carrier was demanding payment of dead freight covering the shortfall of cargo in carrier's opinion, of which K+N was notified by Scan-Trans' e-mail dated 22nd March 2004.

This was immediately rejected by K+N stating that the cargo volume loaded on board was 14,570 cbm including the 21 containers, which was thereafter confirmed by the carrier's agent NARVAL Marine Services & Shipping Ltda in their e-mail 24th March 2004, assessing the total cargo volume to be 14,547.673 cbm including the 21 containers.

## Enclosure # 3

Thus, for K+N the difference were satisfactorily clarified, i.e.

- the carrier's bill of lading stipulates    14,564.640 cbm
- K+N calculated    14,570.000 cbm
- NARVAL's survey stipulates    14,547.643 cbm

The carrier had advised that he intended to conduct another "Weight / Measurement Survey" when discharging the cargo at the port of Callao in Peru.

This was discussed between the parties, but the parties finally never agreed to nominate a joint surveyor.

The surveyor appointed by the Marine Cargo insurers (Crawford) were requested by K+N to check the cargo volume and advised the cargo volume to be 14,882.398 cbm including the 21 containers, i.e. a minor difference of 312.398 cbm or about 2% to what has been invoiced by Scan-Trans on 25th March 2004 and paid by K+N. However, that survey was never considered to be the final and ultimate cargo volume.

The cargo was not intended to be stored at the port, but delivered directly to the consignee's facilities and – after import customs formalities being completed in Peru and cargo being delivered by K+N to the project owner outside the port – the cargo was not at K+N's disposal anymore.

6

# KUEHNE NAGEL 

The carrier appointed a company INTERSEA S.R. Ltda., in Lima, Peru

- through Andes Pacific Services S.A.
- on behalf of Scan-Trans, Inc., Houston as Charterers of the m/v "Global Traveller" c/o Danish Defence Club

for a survey of "Volumetric Quantification of the project shipment discharged ex the m/v Global Traveller" between 3rd and 7th April 2004.

The survey took place from 3rd of April until 8th July 2004 at the port of Callao and at the consignee's facilities in Huachipa, Peru, but without the attendance of K+N.

## 2.2   Summary

- The cargo volume was sufficiently documented at the time of shipment – as explained before – and the parties had agreed terms in the booking note, which does not foresee any additional survey in Peru to challenge the agreed "Weight / Measurement Survey" of the surveyor appointed by the carrier at the loading port.

- K+N refuses to accept the carrier's claim for additional freight in the amount of US$ 73,128.90 and their participation of US$ 3,440.00 in the carrier's cost for their in Peru.

- It is difficult to understand why the survey took 3 months to be completed when it was intended just to measure each and every piece of cargo when being discharged from the ship.

- Whatever the result of the survey of INTERSEA S.R. Ltda. was – it cannot be accepted by K+N -, since the survey was not conducted at the time of discharge from the ship, but only completed until 3 months later.

## 2.3   Settlement of freight and loss of interest

The "Total Freight Cost" were invoiced on 25th March 2004 by

> Seamount International Association Ltd.
> c/o Scan-Trans Inc., Houston, Texas

(identifying Scan-Trans Inc. as agents to Seamount International Association Ltd.)

on the basis of 12,953.00 freight tons plus 21 containers @ 77 cbm each for a total amount due to owners of US$ 618,870.50, with the clarification that

*"The final freight is subject to outturned measurement survey and the invoiced amount have been agreed without prejudice to Carrier's rights under the governing Booking Note."*

7

# KUEHNE – NAGEL 

This amount of US$ 618,870.50 was paid by K+N by swift transfer on 31st March 2004 to the account nominated in the carrier's invoice.

The carrier's claim for interest for delayed payments needs further clarification / substantiation by the carrier, because

- the carrier's invoice is dated 25th March 2004,

### Enclosure # 2

- the payment was made by K+N on 31st March 2004 and received by the carrier on 1st of April 2004 and the non-banking days of the weekend 27th/28th March 2004 are to be considered.

- the ship arrived in Callao on 2nd April 2004 and started discharging on 3rd of April 2004

- the Booking Note – **Clause 30 "Payment Terms"** – stipulate:
  *"100% payable abroad within 3 (three) banking days into carrier's nominated bank account in Denmark."*

  It is not stipulated when the freight is to be paid – K+N assumed 3 banking days after receipt of a correct freight invoice. The receipt of the freight invoice is not documented, however, the period from the invoice date 25th March 2004 until 31st March 2004 are (max.) 5 banking days considering the weekend 27th-28th March 2004 in between.

- The carrier's bill of lading does not stipulate where and when freight is to be paid.

Until the carrier's claim of US$ 1,102.14 for "loss of interest" is sufficiently substantiated, K+N refuses to accept such claim.

III. **RACKING SYSTEM**

Scan-Trans is claiming from K+N the cost of US$ 61,714.70 for a racking system, which they intended to use for the stowage of cargo on board the ship.

This amount is claimed to be:

- Technical Consultation / Planning
  invoiced by TIME Marine Inc., Houston                    US$   5,438.25

- Fabrication of Structures
  as per contract with NSC, Volta Redonda RJ/Brazil        US$ 61,500.00

8

# KUEHNE- NAGEL 

> ➢ Transportation and Storage Cost
> (from 22nd June until 21st December 2004)
> invoiced by Transworthy Servicios Rodoviarios Ltda,     US$ 4,300.00

> ➢ Less actual value of the racking system     US$ 9,600.00

                                                                                                                    US$ 61,638.25

Such racking system and / or it's cost is not part of the Booking Note dated 10th December 2003.

It was never ordered by K+N and there was never any agreement that K+N would reimburse such cost to the carrier.

Only from the communication on 9th January 2004 between Scan-Trans and their agents NARVAL it can be seen now that the carrier intended to double stack the tanks on deck by mean of a racking system. The communication further reads:

*"Christian (of Scan-Trans) have informed me (Lars Juhl of Scan-Trans) that you (NARVAL) had an uncle or other relative involved in the construction of such system. I (Lars Juhl of Scan-Trans) do not have any drawings or quotation in the file. Am I misinformed or do you have any information available which you can pass on to me."*

This shows clearly that the racking system – to be used or not by the carrier – was not part of a commercial agreement between the carrier and K+N.

Only on 1st March 2004 – after confirming the cargo volume being in accordance with the packing lists earlier submitted – Scan-Trans advised that they had designed and constructed a racking system.

**Enclosure # 1**

IV.    **THC IN SANTOS**

4.1    **Booking Note**

The Booking Note dated 10th December 2003 stipulates in

**Clause 10 – "Freight rate" :**
"… basis liner terms hook/hook"

**Clause 11 – "Demurrage rate" :**
*"Cargo to be delivered <u>under</u> vessel's hook as fast as vessel can receive …"*

**KUEHNE - NAGEL** 

**Clause 20 – "Terms":**
*"whereby cargo to be delivered / received alongside directly under vessels hook at risk and expense of merchants."*

**Clause 24 – "Cargo Delivery / Receiving":**
*"At the load port or discharge port, if cargo is delivered or received directly under hook ....."*

**Clause 31 – "Excluded Charges":**
*"Any truck unloading / loading, THC, other terminal charges, wharfage, dues, duties and taxes on cargo and/or freight to be for merchant's account at both ends."*

**Clause 39 – "Taxes and Expenses":**
*"All taxes/dues/duties on cargo and/or freight or calculated on same, to be for Merchant's account. TUP (Port Utilization Tax) by carrier's account."*

### 4.2 GRUPO PORTO's charges

GRUPO PORTO is a private port operator, who was contracted by the carrier's agent for the ship's loading operations at Santos port.

K+N had to deliver the cargo <u>under ship's hook</u> and to pay the cost up to that point.

Scan-Trans had to make arrangements to receive the cargo <u>under ship's hook</u> for the loading of the cargo into the vessel and contracted Grupo Porto for the loading of the vessel from under ship's hook and stevedoring and K+N cooperated with GRUPO PORTO, to simplify the operation, for the shore handling to deliver the cargo <u>under ship's hook</u>.

It is without any doubt, that K+N's responsibility for cost and services ends, when the cargo is delivered <u>under ship's hook</u> as agreed in the booking note and any cost beyond that point are to be paid by the carrier.

The Port of Santos does not clearly define the costs, which are called in most of the ports of the world "THC – Terminal Handling Charge", however, by clear interpretation of the terms of the booking note these cost can only be those costs, which relate to the delivery under ship's hook.

It is common practice in Santos that the costs, which relate to those services commonly understood to be THC, are freely negotiable with the port operator. K+N had made an agreement with GRUPO PORTO for such services, which had been invoiced by GRUPO PORTO to K+N in the amount of R$ 60,000.00 as full and final settlement for the services rendered to K+N under the terms of the booking note between the carrier and K+N.

10

**KUEHNE - NAGEL** 

GRUPO PORTO's invoice for the services rendered was for US$ 51,327.25 and according to GRUPO PORTO this amount includes additional time caused by the carrier's "Supercargo" being in charge for the stevedoring and the stowage of cargo in the ship, who ordered under his directions several times to re-stow the cargo in the ship.

The booking note does not stipulate (clause 24 CARGO DELIVERY) that K+N has to consider any particular sequence of the cargo for delivery under ship's hook, except that the cargo shall be delivered as fast as the ship is able to load.

K+N is of the opinion that delays were caused by the carrier and his stevedore, whereby GRUPO PORTO had to provide the personnel and work to correspond to the loading organized and managed by the carrier's Supercargo.

The observations Thomas Bode, an independent Marine Surveyor employed by K+N during the loading operation confirm that in their report and furthermore confirm that during the whole (loading) operation there was never any lack of "cargo of all sizes" alongside the vessel.

"cargo of all sizes" means that K+N had never caused any interruption or delay of loading operations due to non-availability of suitable cargo for optimal space utilization in the vessel's holds.

As stipulated in the booking note - *Clause 39: TUP (Port Utilization Tax) carrier's account* – the port operation beyond under ship's hook are clearly for the account of the carrier and such costs are charged by "Codesp" – which is the "Companhia Docas do Estado de Sao Paulo" or also called "Porto de Santos Autoridade Portuária" – to the ship's agent.

GRUPO PORTO's invoice includes such charges listed as "Fatura Codesp No. 2.177 & 2.178 (T.U.P.)" and these charges are – as stipulated in the booking note – for carrier's account. It was noted by the copies of those "Codesp" fees that GRUPO PORTO had invoiced even higher amounts than shown on these invoices.

According to Brazilian law the carrier is ultimately responsible for all port expenses and therefore GRUPO PORTO raised a claim on 15th Sept. 2004 against Scan-Trans for the settlement of the unpaid port costs.

In response to GRUPO PORTO's claim Scan-Trans advised them that under their terms of carriage with K+N the THC would be for the account of K+N and offered "to roll the THC issue into their principal's (the Owner's) proceedings against K+N". This statement made by Scan-Trans is not correct.

**<u>Enclosure # 4</u>**

# KUEHNE · NAGEL 

Scan-Trans faxed a copy of the booking note between K+N and them to GRUPO PORTO without requesting K+N's consent, **violating clause 33 of the booking note** (All parties consider this agreement as private and confidential).

This response from Scan-Trans was relayed by GRUPO PORTO to K+N and K+N advised GRUPO PORTO that the all additional cost beyond the full and final settlement made between K+N and them are for the carrier's account.

## V.   DETENTION COST FOR THE VESSEL

The carrier claims detention charges

| | |
|---|---|
| ➢ in Santos | US$ 1,750.00 |
| ➢ in Callao | US$ 12,432.00 |
| K+N had already paid an amount of | US$ 20,000.00 |

being detention invoiced by the carrier in the invoice dated 25th March 2004, which is thus attributable to the vessel while in Santos.

### 5.1   Booking Note

The Booking Note dated 10th December 2003 stipulates in

**Clause 11 – "Demurrage rate (if agreed)":**
*"US$ 10,500.00 per day or pro rata as detention for lack of cargo, cleared documents and/or trucks alongside vessel, both ends. Cargo to be delivered under vessel's hook as fast as vessel can receive and to be delivered under vessel's hook at discharge port as fast as vessel can deliver. If this not happening, Damages for detention to apply."*

**Clause 25 – "Detention" stipulates:**
*"Any delays to the vessel beyond carrier's control to be deemed vessel detention rate of US$ 10,500.00 per day pro-rata, to be applied in case of any time lost in waiting for berth and/or cargo, documents, trucks, barges, railcars, at Loading or Discharging port(s)."*

**Clause 32 – "B/L terms" stipulates:**
*"Subject to all terms and conditions of the carrier's bill of lading."*

**The carrier's bill of lading – ADDITIONAL CLAUSE A** – stipulates:
*"Provided that if the delay is due to causes beyond the control of the Merchant (K+N), 24 hours shall be deducted from the time on demurrage."*

# KUEHNE - NAGEL 

5.2  **Detention Cost**

Any detention charge, which may have been occurred in the loading port Santos had been settled by mutual agreement between the carrier and K+N at an amount of US$ 20,000.00 as full and final settlement, which had been invoiced by the carrier in his freight invoice dated 25th March 2004 and had been paid by K+N accordingly.

<u>**Enclosure # 2**</u>

There is not any further substantiation of the carrier's claim for detention charges in Santos, which could have entitled him to a further claim in excess of the amount mutually agreed between the parties.

The carrier's claim for detention charges occurred in Callao was invoiced by the carrier on 9th April 2004 with an amount of US$ 12,432.00 for 1.184 days (or 28 hours & 35 minutes), however, the cause of detention is not substantiated, except for declaring "Detention in Callao due to strike situation".

5.3  **Summary**

Before K+N considers to accept any detention charge in Callao

- the carrier needs to substantiate such charges in detail and
- provide supporting evidence that the delays to the vessel were beyond carrier's control and
- in such case – in compliance with the terms of the carrier's bill of lading - 24 hours shall be deducted from the time on demurrage if the delay is due to causes beyond the control of the merchant (K+N).

VI.  **CLAIM FOR CARGO DAMAGES**

The loading and stevedoring operation in the loading port had caused severe damages to the cargo, obviously caused by the carrier's stevedores, when stacking the cargo in the ship's hold with insufficient lashing and securing of the cargo. This is shown on various photos taken during the loading and discharging operation.

K+N had held the carrier already responsible for damages occurred during the loading operation and the total cost of damages caused by the carrier to the cargo was assessed upon discharging the cargo in Callao and is claimed to be US$ 564,768.43 for repair and / or replacement. The main damages were suffered by the tanks.

# KUEHNE - NAGEL



The carrier's bill of lading does not contain any reservations regarding the condition of the cargo, except the following remarks:

1) USED 2ND HAND CARGO
2) LOADED FROM OPEN STORAGE
3) ALL CONTAINERS RUSTY, DENTED, REPAIRED

No damages to the tanks and other cargo as reported and assessed upon discharging the cargo in Callao where noted before loading on board the ship in Santos and were consequently caused while the cargo was in carrier's care and under his responsibility.

K+N is the shipper and consignee on the carrier's "clean on board" bill of lading and herewith claim compensation for the damages caused by the carrier.

The carrier's liability under the Booking Note and the covering bill of lading is limited to 2 Special Drawing Rights per kilogram of cargo weight and thus the carrier is obliged to settle the claim on that basis.

The total gross weight as per carrier's bill of lading is 1.614.729,05 kilograms and the weight of the damaged cargo is 306,645.- kilograms and thus the carrier's liability is limited to 713,290 SDR's or US$ 1,087,767.25 in compensation for the damages caused, whereas the actual damages caused by the carrier are assessed to be **US$ 564,768.43**, which we now claim to be compensated for by the carrier.

**We request a time-suit extension for final claim settlement and to advise the carrier accordingly.**

We hope that we have given sufficient explanation and reject the claim presented with your fax dated 24th January 2005.

Yours faithfully
Kuehne + Nagel (AG & Co.)


Nils Wolf
Director
Corporate Project Division

14

### Ham GG, Nils Wolf

**Von:** Ham GG, Nils Wolf
**Gesendet:** Donnerstag, 21. September 2006 17:59
**An:** 'lockhart@clm.com'
**Betreff:** Seamount / KN Arbitration
**Anlagen:** GLOBAL TRAVELLER - Danish Defence Club.doc

Judy,

Attached is our previous response in March 2005 to the Danish Defence Club regarding Seamount's claim.

We never heard from them after that.

Will discuss this in detail with you on Monday.

Best regards
Nils Wolf

21.09.2006